PER CURIAM.
The appellant, R.D., was charged in separate indictments with first degree sexual abuse, see Ala.Code 1975, § 13A-6-66, against his daughters, C.D. (CC-92-934), J.D. (CC-92-935), and E.D. (CC-92-936). The cases were consolidated for trial.
Briefly stated, the evidence at trial tended to show that R.D. touched what his daughters referred to as their “privates” with his finger and his penis, in some instances. Members of the staff at the church the children attended became concerned, based on physical and behavioral manifestations, that the children may have been sexually abused, and they reported their concerns to the Department of Human Resources. In counsel *774 ing sessions following their parents’ divorce after a violent marriage, the children reported that R.D. abused them. The children were examined by several physicians, whose testimony as to the physical signs of abuse differed. The physicians called by the State indicated that C.D. demonstrated signs consistent with anal penetration, and that E.D.’s genital area was possibly consistent with penetration. One of the physicians called by the defense testified that the evidence he viewed indicated that all three children had been sexually abused, but that the abuse had occurred after R.D.’s visitation with them was suspended. R.D. testified on his own behalf; he denied abusing his children and alleged that his ex-wife had, over a period of years, created a scenario in which she could falsely accuse him of sexual abuse.
The jury found R.D. guilty of sexually abusing C.D. and E.D. and acquitted him of the charge involving J.D. He was sentenced to two consecutive 10-year terms of imprisonment.
I
The appellant contends that the trial court erred by refusing to allow experts to testify concerning the results of the Derogatis Sexual Functioning Inventory, the penile plethys-mograph, and the Minnesota Multiphasie Personality Inventory, all of which were administered to the appellant. He contends that his witnesses’ testimony about his performance on these tests demonstrated that he did not manifest the symptoms of a sexual abuser of children, and this evidence was critical to his defense that he did not abuse his daughters. The trial court excluded the evidence after considering the following testimony.
Paul VanWyk, a psychologist at Bullock County Correctional Facility, testified as to the tests, which were administered to R.D. in Atlanta by Dr. Henry Adams. VanWyk was not present when the tests were administered and he reviewed no raw data. He only read the reports. VanWyk stated that the Derogatis Sexual Functioning Inventory is a written test designed to evaluate a person’s sexual knowledge, attitudes, and experience. It does not indicate whether a person did or did not commit a specific sexual crime.
The penile plethysmograph measures variations in the size of a man’s penis in response to a variety of audio and visual stimuli. The stimuli include males and females of all ages, engaged in both consensual and nonconsen-sual sexual behavior. VanWyk testified that the plethysmograph is similar to a polygraph in that both measure physiological responses and the results in both can be affected by medication, alcohol, and smoking. R.D.’s counsel stated that the results of these tests were offered to show the appellant’s sexual tendencies and to establish his good character by showing he lacked a deviate sexual personality.
Deloris Roys, the director of Highland Institute for Behavioral Change, a sex offender treatment center, administered a second battery of tests to R.D. in December 1991. Among those tests were a paper and pencil test, the Minnesota Multiphasie Personality Inventory (MMPI), and the penile plethys-mograph. Roys described the steps followed in administering these two tests, and stated that the tests generally are considered to be valid and reliable. She testified that the MMPI supplies a personality profile; it is not used to measure sexual deviance and does not indicate whether a person is a sex offender. Similarly, she testified that the plethys-mograph measures changes in penis circumference and displays an arousal pattern, but it does not indicate whether the subject actually experienced a sexual episode with a certain individual. Roys acknowledged that she could not state whether R.D. was guilty or innocent of the crimes with which he was charged.
After considering the testimony elicited at the hearings on the admissibility of the evidence, as well as the relevant legal authorities and the arguments of counsel, the trial court held that it would not admit the pleth-ysmograph or the MMPI for the purposes for which R.D. stated they were being offered. (R. 9,135.)[2]
*775 During trial, but outside the jury’s presence, R.D. offered additional testimony of Deloris Roys. Roys stated that, based on the battery of tests she administered to R.D. (all of which, she testified, were valid, reliable, and generally accepted in the scientific community), she concluded that R.D. showed none of the characteristics that would indicate to her that he needed sex offender treatment, and that his test results did not indicate fetishisms, sexual deviations, obsessive compulsive ruminations, or sexual acting out. She further testified that she did not conclude from the test results that R.D. was a pedophile. R.D. then argued to the court that Roys should be permitted to render an opinion as to his character or lack of deviate sexual personality, based on tests she had administered other than the MMPI and plethysmograph. The trial court denied R.D.’s request, stating that character evidence can be proven only through reputation evidence, and citing Washington v. State, 539 So.2d 1089, 1100 (Ala.Crim.App.1988).
R.D. argues on appeal that his experts should have been permitted to testify as to the test results to show that he did not demonstrate the characteristics of a child sex abuser, which he asserted before and during trial (R. 1, 672; R. 9, 3), constituted “good character” evidence. We hold that the trial court properly excluded this evidence.
We begin our analysis by noting that a trial court has broad discretion over the admissibility of expert testimony at trial, and a court’s exercise of that discretion will not be reversed unless it has palpably abused that discretion. E.g., Bowden v. State, 610 So.2d 1256 (Ala.Crim.App.1992). The trial court’s exercise of discretion here is supported by at least two distinct lines of authority. First, R.D. argued at trial that his experts’ testimony as to the test results was “primarily good character evidence showing lack of any deviate sexual personality.” (R. 9, 3.) The trial court correctly stated that the lack of a deviate sexual personality is not permissible character evidence, because Alabama law allows only testimony about general reputation or about reputation as to a specific trait. Washington v. State, 539 So.2d 1089, 1100 (Ala.Crim.App.1989); C. Gamble, McElroy’s Alabama Evidence § 27.01 (5th ed.1996). Because R.D. repeatedly stated that he sought to introduce test results and testimony about the results to establish his good character, and because this, evidence does not properly establish character under Alabama law, it was correctly ruled inadmissible. While the evidence' was properly excluded for this reason alone, the trial court correctly determined that the test results and expert testimony was due to be excluded for another independent reason.
The second reason the evidence was properly excluded at trial is that the results and testimony were irrelevant, as demonstrated by R.D.’s own witnesses. Deloris Roys testified:
“A. Let me preface my remarks by saying, Judge, that a plethysmograph is an instrument we use basically to understand the arousal pattern of an individual. A plethysmograph is not an instrument for making judgment about what a person has done. So what I can say is these are where there were change[s] in the penis circumference size; but it does not tell me whether someone has ever actually experienced a sexual episode with a person of this age category. I think that is a real important piece of information that the court needs to understand about plethys-mography.”
(R. 9, 31.)
As to the written tests, she could state only:
“A. General conclusion regarding pen and pencil is that I found no evidence of any sexual deviations that would make me conclude that this individual needed sex offender treatment.”[3]
(R. 9, 37.)
She could not say, on the basis of the test results, whether R.D. was guilty or innocent. *776 (R. 9, 44.) Finally, Roys testified that the MMPI was not used for measuring sexual deviance. (R. 9, 46.)
The cornerstone of evidentiary law is that relevant evidence is admissible, and irrelevant evidence is not. Thus, even though R.D.’s witnesses gave opinions about.the reliability and validity of the tests, R.D. failed to establish that the evidence was relevant to the case and, in fact, demonstrated that it was not relevant. Evidence that, according to R.D.’s own witnesses, was unrelated to whether he committed the crimes with which he was charged was clearly irrelevant and properly excluded.
In conclusion, we find that the trial court correctly gave thorough consideration to the testimony, caselaw, and arguments offered by R.D. and, under the circumstances of this case, properly refused to admit this evidence.
II
R.D. next argues that the trial court erred in permitting the State’s experts to testify as to their findings and opinions regarding sexual abuse because, he says, they were not qualified to do so, and because, he says, they improperly testified about the ultimate issue in this case.
Alabama cases have consistently held that an expert witness is one who can enlighten the jury because he or she possesses knowledge beyond that of the average person, or who is shown, by training or experience, to be better informed than the average juror. E.g., Arthur v. State, [Ms. CR-91-718, March 8, 1996], — So.2d - (Ala.Crim.App.1996). With equal consistency, our courts have held that the determination of whether a witness is qualified to testify as an expert is a matter for the trial court in its discretion to resolve, and that determination will not be disturbed on appeal unless there has been an abuse of that discretion. Arthur, supra; Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996). Application of the foregoing principles leads us to conclude that the trial court did not err in permitting the State’s witness to testify.
A Dr. Penny White
Dr. Penny. White testified that she graduated from Harvard Medical School in 1976, completed three years of general pediatric training at Howard University Hospital, and has been a practicing pediatrician since 1979. (R. 9, 179-80.) She began her education on child sexual abuse in 1980 or 1981, and initially gained knowledge through professional experience and through reading medical literature on sex abuse. Dr. White testified that she attended two seminars on diagnosing the symptoms of sex abuse, although one seminar was held after she had examined the victims in this case. Finally, she stated that she had testified in court 8 to 10 times and had been accepted as an expert. The trial court accepted Dr. White as an expert, over R.D.’s objection.
We find that the trial court did not abuse its discretion in permitting Dr. White to testify as an expert because of her experience as well as her training and her knowledge of relevant medical literature on the subject as to which she was testifying. The fáct that R.D. objects to Dr. White’s testimony because he disagrees with her findings based on her physical examinations of his daughters is not a ground for exclusion of her testimony. Objections that an expert lacks the requisite knowledge go to the weight, not the admissibility, of the expert’s testimony. Holland v. State, 666 So.2d 547, 548 (Ala.Crim.App.1995.)

B. Dr. Earl Stradtman

R.D. next contends that the trial court erred in permitting Dr. Stradtman to testify as an expert because, he says, he lacked the training and experience to be qualified as an expert. He also claims that Dr. Stradtman was improperly permitted to testify as to conclusions that had no medical foundation. We disagree.
Dr. Stradtman testified that he was a physician who maintained a practice and who *777 taught at the University of Alabama. Part of his practice is devoted to adolescent gynecology, which he explained involved genital abnormalities and certain hormonal abnormalities of children and teenagers. He testified that he graduated from Harvard Medical School, that he completed his residency in obstetrics and gynecology, and that he had previously testified in court. Dr. Stradtman stated that a majority of his practice at Children’s Hospital was related to children age 12 years and under, and that during the time he has practiced, he has seen at least 170 young patients. Moreover, he stated that in his practice he frequently uses a colposcope, a microscope that magnifies the vaginal area during an examination. With regard to training in sex abuse, Dr. Stradtman testified that he had attended educational meetings, has read medical literature, and has consulted with colleagues. The trial court overruled R.D.’s objection that Dr. Stradtman was not qualified to diagnose symptoms of penetration and sexual abuse. Dr. Stradtman testified, generally, that he suspected that C.D. had experienced anal penetration, and that E.D.’s examination indicated possible trauma to her vulva that had healed, and that examination of E.D.’s hymen also indicated possible trauma. He further acknowledged that all of his findings could be present in normal children. (R. 9,162.)
Clearly, Dr. Stradtman’s examinations of many children, alone, establish that he possessed greater knowledge of the subject matter than would the average juror. His experience, education, and knowledge of authoritative literature in the field (R.. 9-154, 160) lead us to conclude .that the trial court did not err in allowing Dr. Stradtman to testify as an expert. Finding no abuse of discretion, we will not reverse that decision.

C. Jeannie Lanier

Finally, R.D. argues that the trial court erred in permitting Jeannie Lanier to testify as an expert on sexual abuse. He contends that “Lanier’s testimony was probably the iriost damaging of any witness who testified at trial.” (R.D.’s brief at 24.) The State asserts that Lanier was never offered as an expert.
Lanier, a victim services counselor at the Sunshine Center, part of the Montgomery Area Family Violence Program, testified about her contacts and counseling sessions with the appellant’s ex-wife and the children. She testified, first, that the children reported that they had been sexually abused, but that R.D. was not named as the perpetrator. (R. 10, 219-47.) The State did not offer Lanier as an expert at this time; therefore, R.D.’s argument with regard to that portion of La-nier’s testimony must fail.
After Lanier testified, the jury viewed the videotaped testimony of the children. (R. 10, 249-68.) During their testimony, the children alleged that they had been sexually abused by their father, the appellant. The court then permitted further examination of Lanier, after determining that the State would be allowed to inquire about the details of the children’s complaints which R.D. raised in his videotaped cross-examination of the children.
During Lanier’s second round of testimony, the State offered her as an expert. The court stated that it “didn’t know that the nature of her testimony today is expert testimony”; then the court mistakenly said it had previously accepted Lanier as an expert. (R. 10, 328-29.) At that point, R.D. objected to Lanier’s being accepted as an expert, but gave no reasons for his objection. Thereafter, Lanier testified as to some of the details of the children’s reports that R.D. abused them and as to her observations of the children’s behavior. In response to questioning from R.D., only, Lanier testified that she believed R.D. had abused' his children. (R. 10,365-66.)
Initially, there is some question whether Lanier actually was accepted as. an expert; the trial.court mistakenly believed that it had accepted her as an expert during her initial testimony and would have allowed that determination to “carry over,” but did not declare her to be an expert. Assuming, for the sake of argument, that the court implicitly determined during Lanier’s second round of testimony that she was an expert, we find that the court did not abuse its broad discretion in making such a determination. *778 Lanier testified that she had been employed for approximately four years by the Montgomery Area Family Violence Program, and that she had worked as a volunteer coordinator, victim services counselor, facilitator for the battered women’s group, and supervisor of the therapeutic child-care group. She stated that she had a master’s degree in counseling and was working toward obtaining a license as a professional counselor. Moreover, Lanier had received training at workshops and national symposiums conducted by experts in the field of child abuse. Lanier testified that she conducted research and read extensively on child sexual abuse. Finally, Lanier stated that she had substantial experience from her work at the Sunshine Center. Based on Lanier’s testimony about her education, training, and experience, we conclude that she had acquired knowledge beyond that of the ordinary witness and could enlighten the jury more than the average “man on the street.” Arthur v. State, supra.
In summary, we find no palpable abuse of discretion in the trial court’s decision to allow Lanier and Drs. White and Stradtman to testify as experts.
Ill
R.D. contends that the prosecutor questioned several witnesses on allegedly improper, irrelevant matters so as to put before the jury inadmissible evidence of prior bad acts.
A
The appellant contends that prosecutorial misconduct occurred when the following questions were asked of several witnesses:
“Q. [Prosecutor]: It wasn’t that time. It was the time that the defendant’s lawyer here asked you about you not letting him in your house so he had to break in?
“A. [Ex-wife]: Oh, that was September, I believe, on that particular incident.
“Q. Now, I want to ask you, the defendant was found guilty of breaking into your home; wasn’t he?
“A. Yes.
“Q. By the court?
“A. Yes, sir.”
(R. 11, 523.)
“Q. [Prosecutor]: Would it surprise you that there has been testimony here that he has been convicted of breaking into his house and found guilty in court?
“A. [Defense witness]: What is your question; would it surprise me to know that?
“Q. Yes.
“A. Yes, it would surprise me, knowing [R.D.].”
(R. 11, 536.)
“Q. [Prosecutor]: Well, tell the jury how you feel about learning that the defendant broke into his former wife’s house and got convicted.
“A. [Defense witness]: Well, I wouldn’t say it is false; but I would say this, we have been to church together and I have been with some other women who have daughters and they have entrusted their daughters with [R.D.]. Knowing these allegations they turned their kids over to him and walked out of the room and left him.
“Q. Let’s go back to what I asked you, sir. You say that the charges against this man here of breaking into his former wife’s home are false?
“A. Charlie, you and I both know there is vast governmental abuse.
“THE COURT: Ask him a question.
“Q. There is vast governmental abuse?
“A. There are cases where charges can more or less be trumped up and evidence brought up later.
“Q. What do you know about those charges?
“A. Which charges, the breaking in of the house, or the allegations—
“Q. What do you know about the breaking in of the house.
“A. I don’t know anything about that, sir.
“Q. Well, how in the world are you suggesting that it is vast governmental abuse if you don’t know anything about it?
“A. Well, they are charges.
“Q. I told you that he was found guilty, sir.
*779 “[Prosecutor]: I don’t have any further questions.”
(R. 11, 547-48.)
“Q. [Prosecutor]: Would it shock you to learn that he was convicted for breaking into his former wife’s home?
“A. [Defense witness]: Shock me; maybe, yes.”
(R. 11, 593.)
The appellant argues that the prosecutor’s questions concerning “breaking and entering” were prejudicial because, he says, he was not convicted of burglary but instead was convicted of criminal trespass in .the third degree. However, R.D. never objected to the prosecutor’s questions on this basis, so this issue is not preserved for review. Hemphill v. State, 669 So.2d 1020 (Ala.Crim. App.1995). Even if the issue had been preserved, we would find no error because the prosecutor did not state that R.D. had been convicted of burglary and because R.D. made it clear to the jury that he had been convicted of criminal trespass in the third degree, not burglary. On direct examination, defense counsel asked the appellant if he had been convicted of breaking into his ex-wife’s home. The appellant answered that he had never been convicted of breaking and entering but that his ex-wife had charged him with criminal trespass in the third degree. On cross-examination, without objection, the appellant admitted that he had been found guilty of criminal trespass in the third degree. Therefore, the jury could not have been prejudiced.
B
The following occurred during the questioning on rebuttal of the director of the nursery ministries of Frazier Memorial Church, Loretta Daughtrey, who also taught the four-year-old class:
“Q. What have you personally observed, I believe, regarding [E.D.], about her behavior when she was in the class?
“A. When she was in my classroom she was very withdrawn, very quiet, wouldn’t hardly interact with the other children.
“MR. KEITH [defense counsel]: Excuse me, Judge, I have to object. If she’s going to be a rebuttal witness—
“MS. FRITH (prosecutor): I was just getting the background.
“THE COURT: I sustain.
“Q. Did you have concerns regarding these children?
“A. Yes, ma'am. I did.
“Q. What did you do regarding these concerns?
“A. A number of years ago—
“MR. KEITH: Judge, I object again. If she is a rebuttal witness she has to rebut testimony, and I don’t—
“THE COURT: Wait a minute. You don’t need to make a jury argument. If you are objecting, I will sustain.
“MR. KEITH: Yes, sir, I am objecting.
“THE COURT: All right.
“Q. Did you make a report to DHR?
“A. Yes, ma'am, I did.
“Q. What years did you make a report to DHR?
“A. The time that I actually was able to talk to someone was 1988. I had made three calls before then and it would always be an answering machine, and I do not talk to answering machines, so I did not leave a number or name. I did not feel that I wanted to leave that kind of information with an answering machine.
“Q. You talked with someone in 1988?
“A. Yes, ma'am.
“Q. Why were you talking to DHR?
“A. All three years—
“MR. KEITH: I object again. This is beyond the scope of rebuttal.
“THE COURT: Overruled.
“Q. Why were you talking to DHR?
“A. Because numerous times through the years the teachers that were in Mother’s Morning Out would come to me and Ms. Henry, who was the—
“MR. KEITH: I object.
“THE COURT: If you are objecting on hearsay, I sustain.
“Q. Why did you call DHR; was it your concern about these girls?
*780 “A. Yes, ma'am. May I continue with what I was saying?
“MR. KEITH: Judge, we object to any hearsay.
“THE COURT: Wait just a minute. You can’t say what somebody told you. Explain it to her, Ms. Frith.
[[Image here]]
“A. Well, I would have never called for the children in Mother’s Morning Out except for the teachers’ concern. I was director and the teachers were concerned that there was something going on with the children.
“Q. Did you see anything that cause you concern?
“A. I never saw any bruises or physical evidence; but I did see [J.D.], something that was very unusual, when a teacher called me and Ms. Henry to her classroom.
“Q. How old was [J.D.] when this occurred?
“A. In the last 12 to 18 months, so she was probably around 22 or 23 months old by that time, because she would have had to have been this age by the time school started in September.
“Q. And what did you, yourself, observe that caused you concern?
“A. Most of the time when you are changing children the genital area and vaginal are not large and exposed; but—
“MR. KEITH: I object. She is not an expert witness.
“THE COURT: Wait just a minute. I’m not hard of hearing. She wants to know what did you see that caused you concern.
“A. That is what I was saying.
“THE COURT: Go ahead.
“A. Usually, as I said, children in the vaginal area of little girls do not have the opening that [J.D.] had at the time, and we were concerned.
“MR. KEITH: Object; she does not have expertise.
“THE COURT: Overruled.
“A. We were very concerned. This is the reason that this particular teacher named ... called it to our attention. We had previously discussed this with our superiors and had been told to do what we felt was needed.
“MR. KEITH: Object. She has no way of knowing.
“THE COURT: Not what somebody told you.
“A. At that particular time is when I called DHR.
“Q. So you made the call in 1988.
“A. Yes, I did.
“Q. And not Mrs. House?
“A. I don’t know anything about Mrs. House calling.
“Q. But you are the one that made the complaint in 1988?
“A. Yes.”
(R. 13, 927-30.) The appellant contends that Ms. Daughtrey’s testimony concerning the complaint she made to DHR was inadmissible as a prior bad act. We find that, although R.D. did object to Ms. Daughtrey’s testimony, no objection was raised on that ground. Therefore, this issue is not preserved. McCord v. State, 501 So.2d 520 (Ala. Crim.App.1986).
Even if this issue had been preserved, we would have found no error. The information concerning the DHR investigation had already been brought out during defense counsel’s direct examination of the appellant’s ex-wife. (R. 11, 471-73.) An appellant will not be heard to complain about allegedly improper testimony when he elicited the same testimony. See, Worthington v. State, 652 So.2d 790, 794 (Ala.Crim.App.1994). Thus, the information concerning the DHR complaint was admissible, and we would have found no error even if the issue had been preserved for our review.
C
During the testimony of Jeannie La-nier, the following occurred:
“Q. [Prosecutor]: All right. When did the sexual abuse become an issue in your counseling with these children; what occurred, specifically?
“A. As part of my routine background I normally take a history on all members of the family, and very early on, probably the *781 second session, it was reported that there had been a disclosure by an older daughter, [L.], during a divorce proceeding where she had alleged that she had been sexually molested.
“[Defense counsel]: Judge, I object again, and make a continuing objection as to any hearsay statements.
“THE COURT: I have ruled on this. I think your record is protected. We will admit the fact of a complaint but not the details.”
(R. 10, 222-28). The witness did not testify further about this complaint.
The appellant contends that Lanier’s statement concerning the fact that the appellant’s older daughter had alleged that she had been sexually abused was inadmissible as a prior act.
However, R.D.’s objection at trial was as to hearsay only, not to the alleged prior bad act. The specific objection waived appellate review of all other grounds not specified. Dozier v. State [Ms. CR-94-2110, July 3, 1996]. Even if the issue had' been preserved for review, we would have found no error. Lanier did not identify R.D. in any way; she testified only that L. had reported prior abuse, not prior abuse by R.D. Therefore, this was not prior bad act testimony and is not inadmissible on those grounds. In fact, it was only later, during defense counsel’s cross-examination, that L. alleged that R.D. abused her. (R. 11, 421-86). R.D., himself, brought that information in and cannot now allege error. Thus, even if R.D. had preserved this issue for review, we would not have found any error.
IV
R.D. argues that the trial court erred in permitting two prosecution witnesses to testify as to hearsay statements from the children and about exhibits that were not admitted into evidence.
A Angel Phillips
Angel Phillips testified that she knew C.D. because C.D. was a member of her Sunday school class and she saw her regularly. She stated that she was very concerned about C.D. one Sunday because she sat, balled up, with a stunned look on her face; she appeared pale, tense, and terrified. When C.D.’s older sister picked her up from Sunday school, she told Phillips- that C.D. was always like that after visiting-with her father, R.D. Phillips said that she contacted the Department of Human Resources and requested an investigation. Phillips testified that the following Sunday, C.D. arrived at Sunday school in a happy, excited state, and said, “I am so happy I don’t have to see my daddy.” (R. 9, 65.) Defense counsel raised what was essentially a hearsay objection, and further requested that the jury be instructed not to consider Phillips’s last answer. The court stated, “I sustain.” R.D. made no further objection. Although he obtained a ruling on his objection, he did not obtain an adverse ruling from the trial court on his request for a jury and he did not object to the court’s failure to rule. E.g., Wilkerson v. State, 686 So.2d 1266 (Ala.Crim.App.1996.) Even if the trial court had ruled adversely to R.D. and the issue had been preserved, we would not have found reversible error. The court could properly have refused to instruct the jury to disregard the witness’s answer, because a portion of it was not hearsay and was responsive to the prosecutor’s question. See Robinson v. State, 38 Ala.App. 315, 82 So.2d 815 (1955) (denial of motion to strike not error where part of witness’s answer is relevant.)

B. Jeanme Lanier

R.D. argues that Jeannie Lanier, who counselled the children, improperly testified as to details of the children’s abuse allegations, and as to certain exhibits that the trial court had previously excluded from evidence. We disagree.
As discussed more fully in Part VIII of this opinion, the children testified by way of videotaped depositions, pursuant to Ala.Code 1975, § 15-25-2. During the depositions, defense counsel had the opportunity to, and did, cross-examine the child victims; defense counsel asked specific questions regarding the details of the allegations of sexual abuse. After the videotaped depositions were shown to the jury, the State sought to recall Jean *782 nie Lanier, arguing’ that it was entitled to elicit full details of the children’s complaints because R.D.’s cross-examination elicited details and questioned the witnesses’ credibility. After consideration of Lanier’s testimony, arguments from the parties, and relevant legal authority, the trial court allowed the State to elicit only details of the complaints about which the appellant had inquired on cross-examination.
The law is well established that while the prosecution cannot initially prove the details of a complaint of a sex offense, where the defendant elicits part of the details of a complaint, the prosecution may elicit all of the details for purposes of corroborating the victim’s complaint. Register v. State, 640 So.2d 3 (Ala.Crim.App.1993), aff'd, 680 So.2d 225 (Ala.1994); Nail v. State, 629 So.2d 772 (Ala.Crim.App.1993). Inmon v. State, 585 So.2d 261 (Ala.Crim.App.1991); McGlown v. State, 598 So.2d 1027 (Ala.Crim.App.1992); Parker v. State, 581 So.2d 1211 (Ala.Crim.App.1991). See also, C. Gamble, McElroy’s Alabama Evidence § 178.01 (5th ed.1996). Therefore, after R.D. elicited from the children certain details of their complaints of sexual abuse, the trial court properly permitted the State to elicit complete details. The trial court acted cautiously and limited the prosecution’s inquiry to the details and topics raised by defense counsel in cross-examination. Thus, contrary to R.D.’s assertions, the trial court did not err in allowing additional inquiry into the details of the children’s complaints.
Finally, R.D. argues that the State violated the court’s ruling during Lanier’s testimony by inquiring into matters beyond the scope of his cross-examination of the children, and by questioning Lanier about the contents of certain exhibits. We note first that the trial court stated that it would not admit as exhibits drawings and documents Lanier had with her, but when the State asked the court to permit Lanier to describe the drawings and documents, the court stated:
“She can go into details on these limited areas that he went into on cross-examination, but no documents....
“If the contents of the documents are strictly directed to corroboration of a specific point he sought to discredit, I’ll permit it for that purpose. I don’t want to go into anything that was not gone into on cross-examination. I will restrict it to those subject matters that the defense lawyer sought to discredit the witness on, and I will permit corroboration about the details of the complaint, all in accord, with 178.01 of McElroy ”.
(R. 10, 307.)
When the witness referred to the drawings and documents in her testimony, the trial court, consistent with its earlier decision, permitted her to read only from and/or describe them. R.D.’s complaint on this point is rejected.
We also find no merit to R.D.’s argument that the State violated the court’s ruling by going beyond the scope of examination allowed. To the contrary, the record shows that when R.D. objected to questions on grounds that the prosecutor inquired into areas that exceeded the scope of his cross-examination, the trial court sustained the objections. (R. 10, 333, 336-42.)
In conclusion, none of R.D.’s objections with regard to these witnesses requires reversal. The trial court committed no error. We affirm as to this issue.
V
R.D. next argues that the trial court erred in denying his request for a continuance, which he made during trial, so he could have the audio- and videotapes of counseling sessions involving the child victims sent for “content analysis.” The State argues that the trial court did not abuse its discretion in denying the continuance. We agree.
On Friday, November 17, 1992, during trial, both parties learned, from Jeannie Lanier, a prosecution witness, about the existence of one audiotape and one videotape of the children that the witness made during counseling sessions. The videotape contained no disclosure of sexual abuse, the witness said, but the audiotape did contain such a disclosure. (R. 10, 246-47.) The defense attorneys received and reviewed the tapes that day, but made no motions and did not make any requests with regard to the tapes. The *783 defense rested its case later that afternoon and the trial recessed until Monday, November 23, 1992. On that date, the court informed R.D. that, because he had argued earlier that the tapes contained exculpatory material, it would permit him to reopen his case if he chose to do so. (R. 13, 936.) R.D. then asked for a continuance to have the tapes sent for “content analysis.” The trial court denied the continuance and asked R.D.' if he intended to reopen his case; R.D. declined. The tapes were never offered into evidence.
It is well settled that a motion for continuance is addressed to the sound discretion of the trial judge, whose exercise of that discretion will not be disturbed on appeal without proof that it was clearly abused. E.g., Arthur v. State, [Ms. CR-91-718, March 8, 1996] — So.2d - (Ala. Crim.App.1996); Smith v. State, 698 So.2d 189 (Ala.Crim.App.1996); Long v. State, 611 So.2d 443 (Ala.Crim.App.1992). Review of a denial of a motion for continuance requires a review of the circumstances of the case, including the reasons the defendant gave to the trial judge in support of the motion, in order to determine whether there was a clear abuse of discretion. Arthur, supra.
The tapes were made available to R.D. on a Friday, before he concluded his case, but he did not request a continuance that day. When he made the motion on Monday, the court noted that, “he has had enough time to have done anything with these tapes that he wants to.” (R. 13, 936). When defense counsel stated that he wanted a “content analysis” of the tapes, the trial court stated that it would allow it, but denied the continuance. “The speculative allegations of defense counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion.” Connor v. State, 447 So.2d 860, 863 (Ala.Crim.App.1984), quoted in Arthur v. State, supra. Here, R.D. did not even offer speculations to the judge about potential witnesses or evidence to show that a continuance would have allowed him to produce anything favorable to his ease. Even at the hearing on the motion for new trial, R.D. failed to present any evidence regarding “content analysis” of the tapes. Moreover, he did not demonstrate that he attempted to, but could not, obtain a witness and/or have the tapes “content analyzed” during the weekend, and that he could, do so if he had more time.
Further, R.D.’s request Was not timely. Although counsel stated when he requested the continuance that the defense’s position from the beginning was that they wanted the tapes analyzed, the motion was not made when the tapes were made available to the defense on Friday. Instead, R.D. completed his case, court recessed for the weekend, and the continuance motion was made on Monday. When this issue was raised at the hearing on the motion for a new trial, the court stated that it appeared the defense had decided not to use the tapes, that the defense did not ask for the tapes over the weekend, or for any other kind of assistance from the court. The court also stated, “If anybody had asked me on Friday, I would have worked with them.” (Supp.R. 2, 39-41.) Finally, it was not at all clear at the time R.D. made his motion that an expert was needed to analyze the tapes, or that the court would have admitted testimony of such an expert. When the tapes were later discussed, the trial court stated, “If you had wanted to use this tape to show that they were improper or leading questions, the jury could look at it just like anyone else. . . .” (R. 13, 940-41.) For all of the foregoing reasons, we find no abuse of discretion in the, trial court’s denial of R.D.’s motion for a continuance.
VI
R.D. alleges that the trial court abused its discretion when it allowed Loretta Daughtrey to testify in rebuttal. (The testimony is set out in Part III, B. of the opinion). Specifically, he claims that Daughtrey’s testimony was inadmissible because, he says, it contained matters that required an expert opinion and because, he says, it contained hearsay. We disagree.
“The admission of rebuttal evidence is within the discretion of the trial judge. Crow v. State, 365 So.2d 1254 (Ala.Cr.App.1978), cert. denied, 365 So.2d 1256 (Ala. 1979). ‘The State may, in the discretion of *784 the trial court, introduce in rebuttal any competent evidence which explains or is a direct reply to or a contradiction of material evidence by the defendant.’ Sprinkle v. State, 368 So.2d 554 (Ala.Cr.App.1978), writ quashed, 368 So.2d 565 (Ala.1979)” (emphasis added).
Norris v. State, 429 So.2d 649, 650 (Ala.Crim.App.1982).
R.D. testified that his ex-wife had fabricated allegations of abuse against him since 1986, and that she had contacted DHR in 1988 or 1989. (R. 12, 632, 735, 737.) Defense counsel also questioned R.D.’s ex-wife about whether she had initiated the DHR investigation and she testified that she did not do so. (R. 11, 471-72.) R.D. sought to attack his ex-wife’s credibility; thus, the State was properly permitted to elicit testimony on rebuttal from Daughtrey that she contacted DHR with the allegations of abuse.
As to R.D.’s assertion that hearsay was improperly admitted, the State argues, and we agree, that the trial court sustained each of R.D.’s hearsay objections. Because R.D. received no adverse rulings on this point, there is nothing to review.
R.D. argues that Daughtrey should not have been permitted to testify that J.D.’s vaginal opening was larger than that of other little girls. We disagree. First, the testimony could not have been harmful because the jury acquitted R.D. of the sexual abuse charge as to J.D. Moreover, this testimony was not improper. Alabama law permits a lay witness to testify to physical conditions the witness observed. Jackson v. State, 674 So.2d 1318 (Ala.Crim.App.1993), rev’d in part on other grounds, 674 So.2d 1365 (Ala.1994). Daughtrey’s testimony was based on her observations and personal knowledge, which, she indicated, she had gained during her many years changing diapers at the church’s nursery. Finally, we note that the testimony came in response to the prosecutor’s inquiry into Daughtrey’s notification of DHR with her allegations of abuse, and was not offered as medical testimony.
Our review of the record convinces us that no error or abuse of discretion occurred.
VII
R.D. next argues that pertinent information was withheld, in violation of a discovery order, and that the withholding resulted in reversible error. The State contends that it had no possession of or control over certain of the evidence that R.D. claims was improperly withheld, and that the trial court correctly determined that other records were protected by a confidentially statute.
R.D. correctly states that before trial he moved for discovery of the records of the Sunshine Center and of Department of Human Resources relating to the children. (R. 1, 90-91). The trial court initially granted that motion, subject to in camera inspection. (R. 1, 90). Counsel for the Sunshine Center objected on grounds that the records were protected by a statute granting a confidential communication privilege to victim counselors, Ala.Code 1975, § 15-23-42, but agreed to provide the records to the court for an in camera review. (R. 8, 535-39). The trial court reviewed the records and determined that all of the documents except one were protected by the confidentiality statute; the one unprotected document was provided to R.D. (R. 4, 789-90.)
During trial, Jeannie Lanier, a Sunshine Center victim counselor who counselled the children, revealed the existence of an audiotape and a videotape of two separate counseling sessions. The videotape contained no allegations of sexual abuse, but the audiotape of the counseling sessions with C.D. and E.D. contained allegations of sexual abuse, she said. Lanier testified that the tapes were at that time in the custody of the ex-wife’s attorney in a civil matter. The audiotape apparently was in custody of the Sunshine Center when the court ordered the records to be released, but was not provided to the court. However, Lanier testified that she made notes from the tape, and those notes were provided to the court. R.D. moved to have the Sunshine Center held in contempt of court for its failure to produce all records in its possession.
Subsequently, the trial court reviewed the tapes and determined that because the State *785 had examined Lanier on rebuttal regarding the details of the children’s complaints, Ala. Code 1975, § 15-23-43(a)(l) applied, and that the protections afforded counselors by § 15-23-42 had been waived, and ordered that the videotape and audiotape be given to R.D.
On appeal, R.D. argues that the State had constructive possession of the tapes because the special prosecutor, Charlie Graddick, had represented the ex-wife in a civil case and must have known about the existence of the tapes. We disagree. The prosecutor told the court that the State was unaware of the existence of the tapes until Lanier testified. (R. 10, 247). There is no evidence to dispute this; the fact that Mr. Graddick represented the ex-wife before hé was appointed special prosecutor does not establish that he knew of. the existence of either or both of the tapes. This is no way comparable to McMillian v. State, 616 So.2d 933 (Ala.Crim.App.1993), cited by R.D., because the taped statement in that case was found to be in the State’s possession because it was actually taken by the State’s investigator. Here, the State never had possession of the tapes, and it violated no rule or order regarding discovery.
R.D. also argues that the trial court erred in applying § 15-24-42 to Lanier because, he argues, the confidentiality statute protects only licensed professional counselors and Lanier was not licensed. He cites Ala. Code 1975, § 15-23-46, regarding licensure, but his reliance on that section is misplaced because it refers to licensure requirements for those dispensing drugs, practicing medicine, and engaging in certain other activities. Ala.Code 1975, § 15-23-41(8) defines “victim counselor” as an employee or supervised volunteer of a victim counseling center who counsels victims for any psychological or emotional condition resulting from sexual assault or family violence. Lanier’s testimony established that she was such a counselor. Moreover, the statute regulating counselors exempts from its coverage and licensure requirements those who practice counseling for public and private organizations, Ala.Code 1975, § 34-8A-3(6); the Sunshine Center is such an organization. Lanier’s lack of a license did not preclude the court from applying the confidentiality provisions. Moreover, the trial court, on its own motion, waived confidentially and made the audiotape and videotape available to R.D. No error occurred with respect to this issue.
VIII
R.D. contends that the court erred in admitting the videotaped depositions of the children because, he says, their testimony was unreliable due to the fact that they were manipulated for months and were asked leading questions in the depositions. He also asserts that the children’s out-of-court statements to others were erroneously admitted, because, he says, the State did not establish the statements’ trustworthiness as required by Ala.Code 1975, § 15-25-32.
A ■
The children were deposed on videotape pursuant to Ala.Code 1975, § 15-25-2, which first requires notice to the defendant and consideration by the trial court of several factors, including the age and maturity of the child. The trial court considered these factors (R. 6, 174-75); R.D. was notified of the depositions, and his counsel was present at the depositions and cross-examined the witnesses. The record establishes that the remaining relevant statutory requirements were also satisfied. R.D.’s assertion that a separate finding of reliability was required pursuant to § 15-25-32 is incorrect; that provision applies to a victim’s hearsay statements. Section 15-25-32 contains no requirements that a court make a determination of reliability. Moreover, the witnesses’ reliability and credibility were matters properly left for the jury, which observed their testimony, including that elicited by R.D. on cross-examination. To the extent the children gave conflicting testimony, that, too, was a matter for the jury to resolve. Washington v. State, 539 So.2d 1089, 1100 (Ala.Crim.App.1988). The trial court would not intrude on any of those jury decisions. Finally, the fact that the children were asked leading questions was not improper, because it is within the trial court’s authority to permit them in a case in which the victim is under the age of 16. Ala.Code 1975, § 15-25-1.
*786 B
We find no merit to R.D.’s claim that the children’s hearsay statements were improperly admitted because they were not proven to be trustworthy, as required by Ala.Code 1975, § 15-25-32. Section 15-25-31, part of the Child Physical and Sexual Abuse Victim Protection Act, provides that a child’s out-of-court statements about an act that is a material element of a crime involving physical or sexual abuse of the child, that would otherwise be inadmissible, can be admitted in evidence if the requirements of § 15-25-32 are met.
Section 15-25-32 provides that a child’s out-of-court statements are admissible if: (1) the child testifies and is subject to- cross-examination, or (2) the child is unavailable to testify and the out-of-court statements are shown to possess particularized guarantees of trustworthiness. The trial court here applied § 15-25-32 as it was codified and as it was interpreted and applied at the time of trial. Thus, the trustworthiness of the children’s hearsay statements was not addressed at trial, in-part because the children testified by videotaped deposition at which they were cross-examined. (Others of the hearsay statements were admitted as common law exceptions to the hearsay rule.) The court complied with § 15-25-32(1).
R.D. correctly cites Ex parte B.B.S., 647 So.2d 709 (Ala.1994), for the proposition that, according to the Alabama Supreme Court today, all hearsay statements admitted under § 15-25-32 must be shown to the reasonable satisfaction of the court to have “particularized guarantees of trustworthiness” that were previously required only when the child did not testify. We find, however, that Ex parte B.B.S, does not require. a reversal. First, we note that the Alabama Supreme Court held as it did only after it reviewed the legislative act and its subsequent codification and “corrected” the statute to' reflect what it believed the legislature intended, which is to impose the “trustworthiness requirement”- on all hearsay statements admitted pursuant to the act. The legislature, to date, has not amended the statute to reflect what the supreme court believes it intended. However, as noted above, the trial court applied § 15-25-32 precisely as it was codified and as it was interpreted up to the date of trial and until the supreme court effectively amended it in 1994 in Ex parte B.B.S. We do not believe that the subsequent reinterpretation of this statute requires reversal of convictions received in this 1992 trial.
Second, the children’s out-of-court statements were admissible pursuant to common law exceptions to the hearsay rule. Section 15-25-40 provides, “Nothing contained in this article shall be construed to limit or prevent the admissibility of any out-of-court statement that would be admissible if this article did not exist.”
Dr. Penny White’s testimony directly from her report of her medical evaluations was entirely proper, irrespective of the statute. See C. Gamble, Alabama Evidence § 110.01(1) (5th ed.1996). Our review of the record establishes that R.D. objected when Dr. White testified other than from her report and that these objections were sustained.
Under Alabama law, when a witness’s credibility is challenged in a case involving sex abuse and/or when a defendant elicits partial details of a sex offense, the prosecution is entitled to elicit full details on rebuttal. Register v. State, 640 So.2d 3 (Ala.Crim.App.1993), aff'd, 680 So.2d 225 (Ala.1994). (See our discussion on Part IV of this opinion.) This is precisely what occurred when Jeannie Lanier testified on rebuttal. Moreover, the trial court limited her rebuttal testimony to the topics covered in R.D.’s cross-examination of the children in their depositions and thus fully protected R.D.’s right to confrontation. This testimony was admissible without reference to the statute and without the requirement that trustworthiness be addressed. In addressing the admissibility of certain evidence in sex offense cases, the Alabama Supreme Court made clear its intent not to liberally extend or to narrowly restrict exceptions to the rule of general exclusion. Bowden v. State, 538 So.2d 1226, 1233 (Ala.1988). Thus, as the court indicated in Bowden, and consistent with § 15-25-40, we find that the common law hearsay exception that permits out-of- *787 court statements regarding details of sex offenses in response to the defense’s cross-examination as to those details in challenging witness’s credibility is not restricted by the statute.
The third reason we believe that Ex parte B.B.S. does not require reversal is that, based on our review of the statutory factors regarding the trustworthiness of an out-of-court statement, set out in § 16-25-37, and our review of the evidence, we find that the statements were sufficiently trustworthy.
R.D. also refers in brief to the admission of the testimony of the children’s mother and of Loretta Daughtrey regarding the children’s out-of-court statements. We note that the children’s mother, R.D.’s ex-wife, was called to testify by R.D., not the State, and it is R.D. who elicited from her numerous out-of-court statements the children made. (R. 11, 448-49, 485-86, 490-92, 498-99, 502, 503-04.) He will not now be heard to complain about any alleged error in the admission of testimony he invited. As to Daughtrey, she offered no out-of-court statements of the children, and all of R.D.’s objections to adults’ hearsay statements were sustained. (R. 13, 925-30.) There being no adverse ruling with regard to Daughtrey, we have nothing to review. Lacy v. State, 673 So.2d 820 (Ala.Crim.App.1995).
Based on the foregoing, we find that R.D.’s arguments on the reliability of the children’s statements do not warrant a reversal.

Conclusion

We have carefully reviewed the entire record, including all of the audiotapes and videotapes, and we find no reason to reverse the trial court’s judgment, entered in accordance with the jury’s verdicts, that R.D. is guilty of sexually abusing C.D. and E.D. We therefore affirm the judgment.
AFFIRMED.
COBB, J., BROWN, J.,* BASCHAB, J.,* and PATTERSON, R.A.J.,** concur.
LONG, P.J., and McMILLAN, J., recuse.

. In this opinion, record citations include the volume number, followed by the relevant page number(s).

. While Roys testified that R.D.’s test results did not suggest that he needed treatment; her report also stated the following:
‘‘[R.D.’s] maximum arousal (19mm change in penis circumference) was produced by inappropriate stimulus (consenting females 14-17 years old). He had 11mm change to appropri *776 ate stimulus (consenting adult females). [R.D.] also was aroused to the following inappropriate stimuli (in addition to that listed above): "consenting male 8-14 years old 9mm change "consenting female 8-14. years old 5mm change.”
(Supp. R. 2, 17.)